1

2                                         **E-Filed 5/17/2011**

3

4

5                    IN THE UNITED STATES DISTRICT COURT

6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                              SAN JOSE DIVISION

8
   WILLIAM A. BAUDLER, Regional Director of        Case Number 05:11-cv-01943 JF/HRL
9  the Thirty-Second Region of the National Labor
   Relations Board, for and on behlaf of the National   ORDER[1] GRANTING PETITION FOR
10 Labor Relations Board,                           INJUNCTION

11                      Petitioner,

12              v.

13 OS TRANSPORT LLC and HCA MANAGMENT,
   INC.,
14
                        Defendants.
15

16

17         Pursuant to section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j),

18 Petitioner William A. Baudler, Regional Director of the Thirty-Second Region of the National

19 Labor Relations Board ("the Board"), seeks to enjoin OS Transport LLC and HCA Management

20 (collectively, Respondents) from engaging in certain alleged unfair labor practices pending final

21 disposition of a complaint currently before the Board.  For the reasons discussed below, the

22 Court concludes that Petitioner has shown a likelihood of success on the merits and of

23 irreparable injury to the integrity of the collective bargaining process and the Board's ability to

24 preserve its remedial powers, and that the balance of the equities and the public interest tip

25 decidedly in favor of granting an injunction.  Accordingly, the instant petition will be granted.

26

27  ─────────────────

28         [1]  This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

Respondents are engaged in the business of hauling waste and recycling materials between various landfills and recycling plants in and around San Jose. OS Transport is owned by Hilda Andrade and her two minor children Oscar Sencion Jr. and Crystal Sencion. Andrade also is the sole owner and only employee of HCA Management. The hauling operations of both companies are held out to Respondents' customers as a single integrated business operation.[2] EX 271-278 (testimony of Don Dean). Oscar Sencion Sr. is Respondents' yard manager and oversees the day-to-day hauling, including route assignments performed by OS Transport's drivers.

In January 2010, Andrade and Sencion Sr. announced to OS Transport drivers and mechanics that the business was being sold to new investors and would have to be restructured. EX 31-32 (testimony of Jesus Garcia Marquez); EX 128-29 (testimony of Miguel Angel Reynoso); EX 246 (testimony of Jose P. Guzman Marquez); EX 328-239 (testimony Marcial Barron Salazar); EX 353 (testimony of Alberto Pizano Martinez). The employees were told that the new investors required the drivers to incorporate as individual corporate entities in order to continue working; the drivers were not told that the "new investors" were Andrade and her children. At a second meeting, held on April 30, 2011, Andrade presented the employees with applications for incorporation written in English and filled out by her attorney. EX 31-32 (testimony of Jesus Garcia Marquez); EX 128-29 (testimony of Miguel Angel Reynoso); EX 353 (testimony of Alberto Pizano Martinez). Most of the employees signed the documents even though several of them could not read or write English and many allegedly did not understand the implications of incorporation. One employee who refused to sign, Julio Escobar, immediately was required to sign a resignation letter. EX 360 (testimony of Alberto Pizano Martinez); EX 483 (testimony of Hilda Cachus Andrade). At the same meeting, Andrade, translating her attorney's statements into Spanish, announced that if employees were thinking

---

[2] Following the convention of the parties the Court will refer to the official transcript of the administrative proceeding, the exhibits in that proceeding, and references to the Board's affidavits as "EX," followed by the relevant page number.

Case No. 05:11-cv-001943 JF/HRL
ORDER GRANTING PETITION FOR INJUNCTION
(JFLC3)

about getting help from a union, they could do so only through their corporations.  EX 31-32
(testimony of Jesus Garcia Marquez); EX 328-239 (testimony Marcial Barron Salazar); EX 353
(testimony of Alberto Pizano Martinez) EX 483 (testimony of Hilda Cachus Andrade).

In early April, 2010, two drivers contacted Teamsters Local Union No. 350, International
Brotherhood of Teamsters, Change to Win, (the "Union") for assistance with their forced
incorporation.  The Union began organizing, and on April 14, 2010, it filed a petition to
represent Respondent's drivers.  EX 38-44 (testimony of Jesus Garcia Marquez); EX 234-236
(testimony Marcial Barron Salazar).  On May 4, 2010, Union supporters signed a joint letter of
protest with respect to their working conditions and the fact that they had been forced to sign
papers that they could not understand. EX 828 (letter).

Miguel Reynoso testified that in a meeting on May 6, 2010, Sencion Sr. told him that all
of the employees who had signed the joint letter would be fired and replaced by new drivers and
that drivers who had not signed the letter would go on working. *See* EX 138-39.  According to
Reynoso, Sencion Sr. also said that if Reynoso renounced the union he could return to a lucrative
route. *Id.*  Rick Lopez, the manager of GreenWaste Recovery, a client of Respondent, testified
that he hired former OS Transport driver Serafin Urias in early May 2010.  EX 287.  Shortly
after hiring Urias, Lopez received a call from Sencion Sr. in which Sencion Sr. said that he was
having problems with the Union and that he believed the Union was paying Urias to infiltrate
GreenWaste. *Id.*  Sencion Sr. also told Lopez that he was planning to hire more workers so that
he could get rid of his "problematic employees." *Id.*

At or about the same time, Sencion Sr. reassigned Reynoso, Alberto Pizano, and Efrain
Gutierrez Najera–all of whom had signed the protest letter and supported the Union–from
lucrative routes to less desirable ones.  EX 138, 144-49, 170-74 (testimony of Miguel Angel
Reynoso); EX 348-50, 392-400 (testimony of Alberto Pizano Martinez).  Other Union supporters
also were reassigned from their previous routes, resulting in fewer loads for which they could be
paid.  Respondent also allegedly began sending Union supporters home early, even when there
was still material to haul, and stopped assigning Saturday work to Union supporters, particularly
those perceived as leaders.

3

On or about August 29, 2010, Jesus Garcia Marquez submitted a written request for time off from September 6 though September 20 for the birth of his child, which Andrade approved. One week into Marquez's approved leave, Andrade cancelled Marquez's company cell phone. When Marquez returned to work on September 20, he was told that his truck was under repair and that he had the option of driving a spare truck or waiting for his assigned truck, which would not be repaired for approximately a week.  Marquez opted to request an additional week of leave. He was told that he would be contacted through a co-worker, Alberto Pizano, when the repairs were completed.  Although Pizano checked in regularly, he was told that Marquez's truck was not ready.  On September 30, Marquez was told in person that is truck was unavailable.  He asked to drive the spare truck but was told that it too needed repairs.  Again, he was told that he would be contacted when the repairs were complete.  On October 15, Marquez received a letter from Andrade stating that he had been terminated for abandoning his job.  EX 54-69, 98-109 (testimony of Jesus Garcia Marquez); EX 387-388 (testimony of Alberto Pizano Martinez); EX 487-491 (testimony of Hilda Cachus Andrade).

On or about November 4, 2010, Andrade received a DMV pull notice showing a speeding ticket for Alberto Pizano.  Upon contacting her insurance broker, Andrade learned that Pizano was ineligible for insurance coverage unless proof of non-fault was submitted with respect to an April 25, 2009, accident appearing on Pizano's driving record.  EX 503-506 Pizano testified that in May 2009, he gave Andrade a copy of the CHP report with respect to the accident, which clearly states that Pizano was not at fault.  EX 379-386; EX 852-862 (exhibits). Pizano also provided Andrade with his own statement about the accident.  *Id.*  Despite these communications, Andrade made no effort to retain insurance coverage for Pizano.  The insurance broker testified that Andrade asked her expressly to make no reference to the fact that Pizano still could be eligible for coverage if proof of non-fault for the April 2009 accident were submitted, as Andrade did not want to give Pizano the opportunity to provide proof.  EX 503-506 (testimony of Cristina Bettencourt); EX 863-869 (exhibits).  When the broker told Andrade that she could not comply with the request, Andrade responded that "she didn't want to employ [Pizano] anymore and didn't want to give him any opportunity to provide the proof."  EX 509.

4

1   The same day, Andrade presented Pizano with a termination letter and advised him that he no

2   longer could be employed because Respondents' insurance company no longer would insure

3   him.  When Pizano told Andrade that she must be mistaken, Andrade told him that it was not her

4   problem and that she could not help him.  EX 375-379.

### II.  LEGAL STANDARD

6      Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), provides

> The Board shall have power, upon issuance of a complaint as provided in
> subsection (b) charging that any person has engaged in or is engaging in an unfair
> labor practice, to petition any United States district court, within any district
> wherein the unfair labor practice in question is alleged to have occurred or
> wherein such person resides or transacts business, for appropriate temporary relief
> or restraining order.  Upon the filing of any such petition the court shall cause
> notice thereof to be served upon such person, and thereupon shall have
> jurisdiction to grant to the Board such temporary relief or restraining orders as it
> deems just and proper.

12   "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,'

13   district courts consider the traditional equitable criteria used in deciding whether to grant a

14   preliminary injunction."  *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 957 (9th Cir.

15   2010).  However, "when evaluating a petition under § 10(j), the court must analyze the request

16   'through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the

17   collective bargaining process and to preserve the Board's remedial power while it processes the

18   charge.'"  *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1207-08 (E.D.

19   Cal. 2010) (quoting *Miller v. Cal. Pac. Medical Ctr.*, 19 F.3d 449 (9th Cir. 1994)); *see also*

20   *McDermott*, 593 F.3d at 957.

21      A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

22   clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council,*

23   *Inc.*, 129 S.Ct. 365, 376 (2008).  "The proper legal standard for preliminary injunctive relief

24   requires a party to demonstrate [1] 'that he is likely to succeed on the merits, [2] that he is likely

25   to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips

26   in his favor, and [4] that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586

27   F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 129 S. Ct. at 374).  The Ninth Circuit recently

28   reaffirmed that within this framework a preliminary injunction also is appropriate when a

5

1  plaintiff demonstrates "that serious questions going to the merits were raised and the balance of

2  the hardships tips sharply in the plaintiff's favor," thereby allowing district courts to preserve the

3  status quo where difficult legal questions require more deliberate investigation. *Alliance for the*

4  *Wild Rockies v. Cottrell*, 613 F.3d 960 (2010).

5  ### III. DISCUSSION

6  **A.    Likelihood of Success on the Merits**

7      In order to establish a likelihood of success on the merits, Petitioner must show that the

8  Board likely will find, and the Ninth Circuit likely will affirm, a finding that Respondents

9  committed the alleged unfair labor practices. *See McDermott*, 593 F.3d at 964.  Petitioner

10  contends that in light of "the district court's lack of jurisdiction over unfair labor practices, and

11  the deference accorded to [the Board's] determinations by the courts of appeals," *Miller*, 19 F.3d

12  at 460,  only a showing of  "some evidence" together with "an arguable legal theory," is

13  necessary to show a likelihood of success on the merits. *Scott v. Stephen Dunn & Assocs.*, 241

14  F.3d 652, 662 (9th Cir. 2001) (quoting *Miller*, 19 F.3d at 460).  However, the Ninth Circuit since

15  has expressed skepticism of the deferential standard articulated in *Miller* in light of the Supreme

16  Court's holding in *Winter v Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  *See*

17  *McDermott*, 593 F.3d at 597, 963 (indicating that the lower court in that case "may have been

18  guided by the 'too lenient' preliminary injunction standards" of pre-*Winter* cases); *Small v.*

19  *Operative Plasterers' & Cement Mason's Int'l*, 611 F.3d 483, 491 (9th Cir. 2010) (stating that

20  "the Supreme Court rejected *Miller*'s deferential standard for granting preliminary injunctions");

21  *but see Garcia*, 733 F. Supp 2d at 1208 fn. 3 (concluding that *McDermott* overruled only

22  *Miller*'s analysis of irreparable injury and that *Small* addressed *Miller*'s likelihood of success

23  prong only in dicta).  In this case, however, the Court concludes that Petitioner's showing is

24  sufficient to satisfy either standard.

25      Petitioner alleges that Respondent has engaged in multiple unfair trade practices in

26  violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act.  Section 7 of the Act

27  gives employees the right to engage in concerted activity for the purpose of mutual aid and

28  protection, which includes both the concerted presentation to management of complaints about

6

1   working conditions, and the right to engage in union activity.  Section 8(a)(1) provides that "[i]t

2   shall be an unfair labor practice for an employer . . . to interfere with, restrain, or coerce

3   employees in the exercise of the rights guaranteed in [Section 7]."  Petitioner presents evidence

4   that Respondents violated this provision by making threats of termination and plant closure,

5   threats to reduce employee work and pay, and promises to restore benefits only if employees

6   abandon their union or other protected activities.  Petitioner also contends that Respondent

7   violated this provision by indicating that it would be futile for employees to obtain union

8   representation because the employees were in fact independent corporations.

9         Section 8(a)(3) makes it an unfair trade practice to engage in discriminatory conduct

10   towards employees as a result of their support for a union.  Petitioner offers evidence that

11   Respondents reassigned Union supporters to less lucrative routes, eliminated their opportunities

12   for additional work, and caused them to suffer extended periods without work by delaying

13   repairs to their vehicles and denying them access to spare trucks.  Petitioner also alleges that

14   Respondents terminated two employees for their union activities.

15         **1.**     **Intimidation**

16         Economic threats to discourage employees from unionizing violates § 8(a)(1) of the

17   NLRA, *NLRB v. Grimm*, 157 L.R.R.M. 2064 (9th Cir. 1996), as does misinforming employees

18   that it would be futile to select a union as their bargaining representative because they are

19   independent contractors rather than employees, *Careful Courier Servs.*, 344 N.L.R.B. 485

20   (2005).  Petitioner has presented evidence from the hearing before the administrative law judge

21   indicating that Andrade and her attorney told employees that they would have to form their own

22   corporations in order to continue working and that they could unionize only their own

23   corporations.  EX 483.  In addition, Reynoso testified that Sencion Sr. told him that all of the

24   employees who had signed the joint letter protesting their work conditions would be fired and

25   replaced by new drivers, and that the drivers who had not signed the letter would go on working.

26   EX 138-39.  Reynoso also testified that Sencion Sr. told him that if he renounced the Union he

27   could return to a lucrative route.  *Id.*  The seriousness of this threat is confirmed by Sencion Sr.'s

28   comments to his client, Rick Lopez, that he intended to get rid of his "problematic employees."

1    EX 287.

2         In their opposition papers, Respondents contend that Andrade's comments that drivers

3    could form a union in their own corporations did not convey the message that Respondent would

4    not recognize and bargain with a union or imply that bargaining would be futile.  However, in

5    light of the fact that several drivers testified to their lack of understanding of the incorporation

6    process and Respondents dominant role in that process, including the forced resignation of Julio

7    Escobar, the Board reasonably could conclude that Andrade's comments were meant to indicate

8    that it would be futile to unionize once the employees were individually incorporated.

9    Moreover, Respondents do not contest the testimony of Reynoso, which describes Sencion Sr.'s

10   threats of economic reprisal for union activity and offer of incentives for abandoning the union.

11            **2.       Changes in Union Supporters Work and Hours**

12        Petitioner contends that there is substantial evidence that immediately upon learning the

13   identity of employees who supported the Union, Respondents reassigned those individuals to

14   less lucrative, more onerous routes, eliminated much of their Saturday work, and sent them home

15   early even when there was still material to haul.  Respondents claim that of the ten employees

16   whose routes allegedly were changed, only five earned substantially less once absences outside

17   of Respondents' control are taken into account.  They also argue that evidence was presented

18   indicating that drivers' routes were dictated by the materials that needed to be transported rather

19   than by Respondents, and that the drivers determined their Saturday work themselves.

20        The evidence presented at the hearing provides substantial support for Petitioner's

21   claims.  Respondents' payroll records show a significant contrast between the amount of

22   Saturday work given to Union supporters before and after they signed the protest letter, while

23   drivers not known to be supporters experienced no change in their pattern of Saturday

24   assignments, and new employees hired after the protest letter worked virtually every Saturday

25   for the rest of the year.  Likewise, Respondents' records indicate that while the drivers taken off

26   of lucrative routes occasionally returned to those routes, they did those on a much less frequent

27   basis.  These changes are consistent with the threats that Sencion Sr. allegedly made to Reynoso

28   and the comments he allegedly made to Lopez.  While it is possible that the Board will be

8

1   persuaded by Respondents' alternative explanations, the Court concludes that Petitioner has

2   satisfied his burden of showing that he is likely to succeed on the merits.

3       **2.     Termination of Jesus Garcia Marquez**

4          In order to support a finding that an employer was motivated by an anti-union animus in

5   terminating an employee, Petitioner must "make a prima facie showing sufficient to support the

6   inference that protected conduct was the 'motivating factor' in the employer's decision.  Once

7   this is established, the burden will shift to the employer to demonstrated the same action would

8   have taken place even in the absence of protected conduct."  *Healthcare Employees Union,*

9   *Local 399 v. N.L.R.B.*, 441 F.3d 670, 680 (9th Cir. 2006) (quoting *Wright Line*, 251 NLRB 1083,

10   1089 (1980)).

11          Petitioner contends that record evidence, including the testimony of Marquez and his co-

12   worker Pizano, shows that Respondents seized upon Marquez's alleged abandonment of his job

13   to remove a leading union activist away from the work place.  Petitioner also points out that the

14   weight of the evidence, including the comments by Sencion Sr. to Lopez and Reynoso, support

15   the allegation that Marquez's so-called abandonment was a pretext.  Respondents argue that

16   because the union activities at issue occurred in May and Marquez was terminated in October,

17   there is no nexus between Marquez's previous activities and the decision to terminate.

18   Respondents also claim that they were under no obligation to make efforts to contact Marquez

19   after he failed to return to work, and that after October 1, 2010, Marquez admittedly made no

20   effort to inquire about his return.  Respondents point out that failing to report to work without

21   calling in unquestionably is legitimate grounds for termination under Board precedent.  *See*

22   *Engineered Comfort Systems, Inc.*, 346 NLRB 661 (2006).

23          Unlike the situation in *Engineered Comfort Systems, Inc.*, in which an employer directed

24   a union activist to report to a particular job-site and the employee subsequently left on a week's

25   vacation leaving only a voice-mail message, there is no evidence in the present record that

26   Marquez refused to report to work when asked, and there is evidence that in fact Marquez made

27   arrangements to return to work as soon as his truck (or a spare truck) was available.  In addition,

28   Respondents' cancellation of Marquez's cell phone during his approved absence indicates that

1  they not only made no attempt to contact Marquez prior to termination but also made such

2  contact more difficult.  These actions, combined with Sencion Sr.'s alleged comments with

3  respect to retaliation, are sufficient evidence to support a conclusion by the Board that the

4  termination of Marquez was an unfair trade practice.

5        **3.**     **Termination of Alberto Pizano**

6         Respondents contend that they had legitimate grounds for terminating Pizano, and that

7  there is little evidence to support Petitioner's claim that they were motivated to terminate Pizano

8  in November for signing a letter in May.  In addition, Respondents claim that they did not have

9  proof that Pizano was not at fault for his accident, and that they provided him with the contact

10  information of the insurance broker so that he could contact the broker directly.  Finally,

11  Respondents admit that they did not want Pizano to return to work once he was declared

12  uninsurable, but that they were motivated by Pizano's poor driving record rather than his union

13  activity.  Respondents note that "[t]he fact that Respondents may have been glad to be presented

14  with an opportunity to discharge [a pro-union employee] is legally inconsequential."  *Shen Auto.*

15  *Dealer Group*, 321 NLRB 586 (1996).

16         As Petitioner points out, Respondents fail to address Pizano's uncontroverted testimony

17  that Andrade had the CHP report finding non-fault in Pizano's personnel file and that Andrade

18  attempted to have the insurance broker remove from the exclusion letter any reference to the fact

19  that Pizano could still be eligible for coverage if proof of non-fault for the April 2009 accident

20  were submitted.  This evidence, along with Sencion Sr.'s the comments described above, are

21  sufficient to establish a *prima facie* case of retaliation and to support a finding that Respondents

22  are unlikely to sustain their burden of proving that Pizano would have been terminated absent his

23  Union activities.

24  **B.**    **Irreparable Harm**

25         Petitioner also must establish a likelihood of irreparable harm in the absence of

26  preliminary relief.  *McDermott*, 593 F.3d 957 (holding that the previous precedents indicating

27  that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary

28  injunction may be entered based only on a 'possibility' of irreparable harm" were now

10

1   "defunct").  In evaluating the likelihood of irreparable harm, courts must "take into account the

2   probability that declining to issue the injunction will permit the allegedly unfair labor practice to

3   reach fruition and thereby render meaningless the Board's remedial authority."  *Miller*, 19 F.3d

4   at 460.

5        Petitioner contends that the interim relief he requests, particularly the reinstatement of

6   terminated employees and a cease and desist order, is necessary to prevent irreparable injury to

7   employees' statutory rights and to protect the Union's nascent organizing campaign.  Petitioner

8   claims that Respondents' acts of retaliation against Union supporters, including termination and

9   unfavorable assignments, threaten to chill the exercise of statutory rights by employees.

10  Petitioner assers that this chilling effect is likely to erode support for the Union before the Board

11  issues its decision.  EX 538-39 (affidavit of union organizer).  Petitioner also claims that

12  Respondents' actions raise concerns that the terminated employees and others afraid of reprisal

13  may look for new jobs, EX 540, thus undermining the Board's ability to provide a complete

14  remedy.

15       Respondents argue that Petitioner has failed to show a likelihood of irreparable harm to

16  the Union's organizing efforts.  They claim that no testimony was elicited from any of the

17  drivers who testified at the hearing that they were less likely to support the union because they

18  were fearful for their jobs.  While one driver who had supported the Union later disavowed his

19  support and asked forgiveness from Respondents, Respondents point out that the driver did not

20  testify that his disavowal had anything to do with Respondents' actions.  They contend that the

21  only evidence of irreparable harm is hearsay contained in the affidavit of the Union's organizer.

22       Respondents also observe that the Union was able to reaffirm the support of nine of its

23  ten remaining supporters through signatures on authorization cards obtained after the

24  terminations and that claims that Marquez must be reinstated immediately because he is a lead

25  organizer are belied by the fact that the Union has used other drivers as organizers.  Finally,

26  Respondents argue that Petitioner's delay in seeking injunctive relief demonstrates the absence

27  of irreparable harm.  They note that although the Union's initial charges were filed by the Union

28  in May 2010 and the charges alleging the unlawful termination of Marquez and Pizano were

11

1    filed in November 2010, Petitioner did not seek injunctive relief until April 2011.

2            Petitioner points out that an expedited unfair labor practice proceeding before an

3    administrative law judge occurred at the end of February and beginning of March, and that the

4    present petition was filed as soon as possible after the record of that proceeding could be

5    reviewed.  Petitioner has made a substantial showing that Respondents engaged in serious unfair

6    labor practices, including the termination of a lead organizer and another Union supporter,

7    retaliation against Union efforts in the form of unfavorable assignments, threats to Union

8    supporters, and promises of improved treatment of employees who disavow the Union.  These

9    actions appear calculated to chill the employees' rights to the point that the organizing campaign

10   could be defeated before to the Board issues its final determination with respect to the complaint

11   at issue.  In particular, the risk that the terminated employees and those who have been retaliated

12   against will be scattered to other employers and that other potential union supporters will remain

13   silent for fear of similar treatment threatens the continued existence of any organizing effort.

14   Accordingly, the Court concludes that Petitioner has shown a likelihood of irreparable harm.

15   **C.    Balance of the Equities and the Public Interest**

16           Respondents contend that the equities tip in their favor in light of the challenges facing

17   them as a small business and the cost of rehiring the terminated employees and balancing the

18   Saturday schedules.  However, in light of the substantial evidence that Respondents engaged in

19   unfair labor practices and the likelihood that employees were retaliated against simply for

20   exercising their right to engage in efforts to bargain collectively, the balance of the equities tips

21   in favor of Petitioner.  Respondents' efforts to require employees to sign incorporation

22   documents that they did not understand in a language that the employees could not read raises

23   serious concerns about Respondents' good faith in this matter.

24           Congress adopted § 10(j) of the National Labor Relations Act for the purpose of

25   preventing unfair labor practices that later action by the Board could not remedy.  The public has

26   a strong interest in seeing that employees–particularly those at risk of being taken advantage of

27   by their employers–have the right to organize and bargain collectively.  On the record before the

28   Court, it appears that it is decidedly in the public's interest that Respondents' employees be

                                                    12

1   assured of their right to bargain collectively without fear of coercion.

2                              **IV.  ORDER**

3          Good cause therefor appearing, pending the final disposition of the related matter now

4   before the National Labor Relations Board, the petition will be granted as follows:

5          Respondents, their officers, representatives, agents, servants, employees and all persons

6   acting on their behalf are:

7          A.  Enjoined and restrained from:

8                  1) Telling employees that they can unionize only under their own corporations,

9   thus implying that their support for the Union is futile; offering employees improved working

10  conditions if they abandon their support for the Union; and, telling employees that they will be

11  terminated, they will lose their jobs, they will receive reduced work and hours, or that

12  Respondents will sell or close the business because the employees support the Union or engage

13  in protected concerted activities, such as signing a letter protesting Respondents' mistreatment of

14  employees;

15                  2) Reducing employees' work assignments and hours because employees support

16  the Union or engage in protected concerted activities, such as signing a letter protesting

17  Respondents' mistreatment of employees;

18                  3) Terminating employees because they support the Union or engage in protected

19  concerted activities, such as signing a letter protesting Respondents' mistreatment of employees;

20                  4) In any like or related manner interfering with, restraining, or coercing their

21  employees exercise of the rights guaranteed under Section 7 of the National Labor Relations Act.

22         B.  To take the following affirmative action:

23                  1) Immediately restore its employees' work assignments and hours to the status

24  quo ante;

25                  2) Within seven (7) days of issuance of this Order, offer interim reinstatement to

26  Jesus Garcia Marquez and Alberto Pizano to their former positions and previous wages and

27  working conditions, and reinstate them immediately upon acceptance of that offer;

28                  3) Upon the Union's request, for a period of one year from the date of this Order

Case No. 05:11-cv-001943 JF/HRL
ORDER GRANTING PETITION FOR INJUNCTION
(JFLC3)

1   or until further order of this Court or the Board, furnish the Union with the full names and

2   addresses of its current employees.

3   　　　　4) Within seven (7) days of issuance of this Order, hold a meeting or meetings,

4   scheduled to ensure the widest possible attendance, at which this Order is to be read to the

5   employees in both English and Spanish by Respondents' owner/manager Hilda Andrade, or at

6   Respondents' option, by a Board agent in Andrade's presence.  The Board shall be afforded a

7   reasonable opportunity to provide for the attendance of a Board agent at any assembly of

8   employees called for the purpose of reading the Court's Order.

9   　　　　5) Within seven (7) days of issuance of this Order, post copies of the Order in

10  both English and a Spanish translation approved by the Petitioner at Respondents' facility on

11  bulletin boards or other conspicuous locations where notices to employees are typically posted,

12  and grant agents of the Board access to Respondents' facility to monitor compliance with the

13  posting requirements;

14  　　　　6) Within fourteen (14) days of the issuance of this Order, file with the Court,

15  with a copy submitted to the Petitioner, a sworn affidavit from a responsible official of the

16  Respondents, setting forth with specificity the manner in which Respondents have complied with

17  the terms of the Order, including how, when, and to whom the Order was read.

18

19

20  IT IS SO ORDERED.

21  DATED: May 17, 2011

22  　　　　　　　　　　　　　　　　JEREMY FOGEL
　　　　　　　　　　　　　　　　United States District Judge

23

24

25

26

27

28

14

Case No. 05:11-cv-001943 JF/HRL
ORDER GRANTING PETITION FOR INJUNCTION
(JFLC3)